**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**

**GREATER CINCINNATI NORTHERN  :         Case No. 2:20-CV-00096
KENTUCKY APARTMENT ASSN.,
et. al.                                          :**

**v.                                               :**

**JOHN MIDDLETON, et. al.               :**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS EMERGENCY MOTION FOR
RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION WITH VERIFIED
COMPLAINT IN SUPPORT**

**I.        Introduction**

This action challenges Kentucky Governor Andrew Beshear's closing of Kentucky Courts to

landlords for the non-payment of rent, while leaving those same courts open for tenants to sue

landlords, and without ensuring that Kentucky's property owners have adequate security or even

the ability to operate in the interim.  Many landlords, including the Plaintiffs in this case, have

bent over backwards to work with tenants impacted by COVID-19 (explained in detail below).

But some have not: some tenants have abused the system, the situation, and their landlords,

leaving the landlords with costly bills, maintenance costs, and utilities, while the tenants literally

have thumbed their nose at the landlords.  Almost two hundred years of clearly established case

law say that this is not constitutional, even in times of emergencies, and so the Plaintiffs bring

suit.

**II.       Facts**

On March 25, 2020, Kentucky Governor Andrew Beshear suspended all evictions in the

Commonwealth of Kentucky, under a declaration of Emergency in Executive Order 2020-257, a

true and accurate copy of which is attached as **Exhibit A** to Plaintiffs' Complaint.  (Pl.'s Verified

1

Compl., RE#1, ¶1).

The Federal CARES Act (P.L. 116-136), at Section 4024(b) likewise provided for an eviction moratorium for 120 days (until July 25, 2020), but this was limited to "covered dwellings," which are rental units in properties: (1) that participate in certain federal assistance programs, (2) are subject to a "federally backed mortgage loan," or (3) are subject to a "federally backed multifamily mortgage loan."  (Pl.'s Verified Compl., RE#1, ¶2).  For purposes of this Motion, we describe evictions that are exempted by the CARES Act moratorium eviction are described as "CARES Act Exemptions."  *Id.*

On May 8, 2020, Governor Beshear subsequently modified Executive Order 2020-257, in Executive Order 2020-323, a true and accurate copy of which is attached as **Exhibit B** to Plaintiffs' Complaint.  This order re-opened evictions for every cause permitted under law except for non-payment of rent (including failure of a lease to be renewed, property damage, or other causes).  In relevant part, it states:

> 7. Evictions Suspended. Pursuant to the authority vested in me by KRS Chapter 39A, evictions from residential premises for failure to pay rent within the Commonwealth are suspended, and all state, county, and local law enforcement officers in the Commonwealth are directed to cease enforcement of orders of eviction for residential premises for the duration of the State of Emergency under Executive Order 2020-215. No provision contained within this Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage. This provision of this Order shall be an amendment to paragraph 5. of Executive Order 2020-257.

Collectively, the Executive Orders at Exhibits A and B are denoted in the Complaint, and this Motion, as the "No-Eviction Orders."  The No-Eviction Orders have absolutely no expiration date and may extend into the future for perpetuity.  (Pl.'s Verified Compl., RE#1, ¶5).

The Kentucky Supreme Court has issued an several orders implementing these orders, with the current effective version denoted as Kentucky Supreme Court Order 2020-44, a true and

accurate copy of which is attached as **Exhibit C**.   (Pl.'s Verified Compl., RE#1, ¶6).  The Kentucky Supreme Court has created several task forces for Kentucky Court re-openings.  (Pl.'s Verified Compl., RE#1, ¶7).  The District Court task force has undertaken to review evictions. *Id.*  Attorney members of that task force have confirmed with Plaintiffs that the Kentucky Supreme Court is merely implementing the Governor's Executive Orders when it comes to evictions, and, if the Governor's executive orders are found to be unconstitutional, the Kentucky Supreme Court will amend Kentucky Supreme Court Order 2020-44 to begin evictions again for non-payment.  *Id.*

Plaintiff Greater Cincinnati Northern Kentucky Apartment Association ("GCNKAA") was founded and incorporated in 1982. (Pl.'s Verified Compl., RE#1, ¶10).  Since its early days, the association has enjoyed numerous accomplishments and expansion, growing to represent the owners and management companies of more than 100,000 apartment homes throughout the Greater Cincinnati Northern Kentucky area.  *Id.*  The GCNKAA is a 501(c)(6) non-profit trade organization which provides the local multifamily housing industry with legislative support, education, networking opportunities, community outreach to benefit our membership and the communities we serve, and, when appropriate, will bring litigation on behalf of its members to vindicate property owner and manager rights.  *Id.*

Its members represent all facets of the multifamily housing industry: apartment owners, management executives, developers, builders, investors, property managers, leasing consultants, maintenance personnel, grounds, janitorial and housekeeping, suppliers and related business professionals.  *Id.*  GCNKAA members have apartments and other rental properties in Kenton, Campbell, and Boone Counties who have been adversely impacted by the challenged orders, and which have adversely impacted the GCNKAA as it deprives the GCNKAA membership of

resources that are otherwise paid towards member dues.  *Id.*

The GCNKAA membership is routinely adversely affected by the No Eviction Orders, as numerous members of the association have long term written leases, are not subject to CARES Act Exemptions, have those same tenants refusing to pay rent, have issued the requisite 7-day notices for non-payment, and have had evictions refused to be accepted for non-payment, by the Defendant Circuit Clerks, despite otherwise tendering all required forms and fees and even though these evictions do not involve CARES Act Exemptions, under the No Eviction Orders. (Pl.'s Verified Compl., RE#1, ¶11).  The written leases in question all allow for default and termination, and eviction, with seven days' notice for non-payment, which are essential and material terms of the written leases.  *Id.*

GCNKAA has established a tenant assistance fund to help tenants who are having trouble paying rent.  (Pl.'s Verified Compl., RE#1, ¶12).  It also has established relationships with community organizations to help tenants find jobs and rent assistance.[1]  *Id.*  It has strongly encouraged both landlords and tenants to "make payment agreements with those who cannot pay, similar to when the government shutdown occurred."  *Id.*

Throughout the GCNKAA, its landlords have entered into such agreements for those tenants who are willing to work with the landlords.  (Pl.'s Verified Compl., RE#1, ¶13).  What is left, and at issue in this case, are evictions for those tenants who refuse to work with their landlords.[2]  *Id.*

Anduril Strategy, LLC ("Anduril"), is the property owner and manager of The Blake at

---

[1] https://www.gcnkaa.org/apartment-association-help-and-tips.html (last visited 7/6/2020).
[2] To be clear, and for the avoidance of all doubt, Plaintiffs do not seek to pursue in this matter, and do not challenge, at this time, properties or tenants or evictions involving CARES Act Exemptions.

Park Hills, an apartment building located in 1215 Elberta Circle in Park Hills, Kenton County,

Kentucky 41011.  (Pl.'s Verified Compl., RE#1, ¶14).  Anduril is a member of the GCNKAA.

*Id.*  Anduril has several tenants on long term (greater than 6 month) written leases who have

been, and continued to, refuse to pay.  *Id.*  The written leases in question all allow for default and

termination, and eviction, with seven days' notice for non-payment.  *Id.*  Anduril is not subject to

any exemptions from evictions in the CARES Act.  *Id.*

Anduril has called all of its tenants who have indicated difficulties with payments, and

offered to: (i) place them on a payment plan; (ii) to reduce their rent; (iii) put them in touch with

community resources able to help assist them with rent.  (Pl.'s Verified Compl., RE#1, ¶15).

These efforts have not resulted in responses.  *Id.*  The response by Anduril's tenants is not

unique, and echoes what the landlord members of the GCNKAA have heard from their tenants

who have been refusing to pay any rent in Kenton, Campbell, and Boone Counties.  (Pl.'s

Verified Compl., RE#1, ¶16).

Anduril has attempted to file evictions for non-payment with the Kenton County Circuit

Clerk, Defendant John Middleton, but, even though it tendered all required forms and fees for

such evictions and even though these evictions do not involve CARES Act Exemptions, due to

the No Eviction Orders, those eviction filings have been refused.  (Pl.'s Verified Compl., RE#1,

¶17).

Cayton Development, LLC ("Cayton") is the property owner and manager of the

Charleston Pines Apartment Homes, which is an apartment building located at 1700 Charleston

Court, in Florence, Boone County, Kentucky.  (Pl.'s Verified Compl., RE#1, ¶18).  Cayton has

several tenants on long term (greater than 6 month) leases who have been, and continued to,

refuse to pay rent.  *Id.*  The written leases in question all allow for default and termination, and

eviction, with seven days' notice for non-payment.  *Id.*  Cayton is not subject to any exemptions from evictions in the CARES Act.  *Id.*  Cayton has given these tenants a 7-day notice for non-payment of rent.  *Id.*

Cayton has called these tenants, as it has called all of its tenants who have indicated difficulties with payments, and offered to: (i) place them on a payment plan; (ii) to reduce their rent; and (iii) put them in touch with community resources able to help assist them with rent. (Pl.'s Verified Compl., RE#1, ¶19).  These offers have not been responded to.  *Id.*

Cayton has attempted to file evictions for non-payment with the Boone County Circuit Clerk, Defendant David Martin, but, even though it tendered all required forms and fees for such evictions and even though these evictions do not involve CARES Act Exemptions, due to the No Eviction Orders, those eviction filings have been refused.  (Pl.'s Verified Compl., RE#1, ¶20).

Vail, LLC ("Vail") is the property owner and manager of the Aspen Pines Apartment Homes, which is an apartment building located at 1700 Aspen Pines Drive, Campbell County, Kentucky.  (Pl.'s Verified Compl., RE#1, ¶21).  Vail has several tenants on long term (greater than 6 month) written leases who have been, and continued to, refuse to pay rent.  *Id.*  The written leases in question all allow for default and termination, and eviction, with seven days' notice for non-payment.  *Id.*  Vail is not subject to any exemptions from evictions in the CARES Act.  *Id.*  Vail has given these tenants a 7-day notice for non-payment of rent.  *Id.*

Vail has called these tenants, as it has called all of its tenants who have indicated difficulties with payments, and offered to: (i) place them on a payment plan; (ii) to reduce their rent; and (iii) put them in touch with community resources able to help assist them with rent. (Pl.'s Verified Compl., RE#1, ¶22).  These offers have not been responded to.  *Id.*  Vail has attempted to file evictions for non-payment with the Campbell County Circuit Clerk, Defendant

Tonya Nolan Jack and even though these evictions do not involve CARES Act Exemptions, but, due to the No Eviction Orders, that eviction filing has been refused. (Pl.'s Verified Compl., RE#1, ¶23).

The No Eviction Orders, with other provisions of Kentucky law, in addition to the Plaintiffs own leases, compels landlords and property owners to continue paying for the tenants' utilities, and to continue maintaining secure and habitable living units pursuant to the terms of the leases. (Pl.'s Verified Compl., RE#1, ¶24). The No Eviction Orders fails to provide any protection for the property owners who are unable to pay their mortgages, utilities and operating expenses needed to continue providing habitable units to their tenants. *Id.*

While the No Eviction Orders ostensibly protects tenants who are unable to pay rent due to circumstances related to the COVID-19 pandemic, it contains no such requirements that a tenant actually be impacted by COVID-19, no requirement that a tenant make a showing that they have been impacted by COVID-19, it flatly prohibits evictions for non-payment, as opposed to permitting a tenant to raise a defense that the tenant has been adversely impacted by COVID-19, and it arbitrarily shifts the financial burden onto property owners, many of whom were already suffering financial hardship as a result of the COVID-19 pandemic and have no equivalent remedy at law. (Pl.'s Verified Compl., RE#1, ¶25). Notably, the No Eviction Orders does not require tenants to provide notice of COVID-19-related inability to pay to the landlord or to provide documentation to the landlord. *Id.*

The No Eviction Orders fails to provide any tribunal or mechanism by which property owners and landlords may obtain redress from a tenant's refusal to pay, even if they are able to pay, even if they are working and receiving full wages. (Pl.'s Verified Compl., RE#1, ¶26). Indeed, the Governor did everything in his power to eliminate all judicial remedies available to

property owners.  *Id.*

This is particularly troublesome when one considers that the CARES Act expands the scope of individuals who are eligible for unemployment benefits, including those who are "furloughed" or otherwise unemployed as a direct result of COVID-19, including self-employed individuals, independent contractors, gig workers/freelancers, and those who have exhausted state and federal unemployment benefits. (Pl.'s Verified Compl., RE#1, ¶27).  It provides for Economic Impact Payments to American households of up to $1,200 per adult for individuals whose income was less than $99,000 (or $198,000 for joint filers) and $500 per child under 17 years old – or up to $3,400 for a family of four.  *Id.*  The Act adds $600 per week from the federal government on top of whatever base amount a worker receives from the state.  *Id.*

Under the CARES Act, employers of all sizes that face closures or suffer economic hardship due to COVID-19 are incentivized to keep employees on the payroll through a 50% credit on up to $10,000 of wages paid or incurred from March 13, 2020 through December 31, 2020.  (Pl.'s Verified Compl., RE#1, ¶28).

To be eligible for unemployment benefits under the CARES Act, individuals must provide self-certification to the state that they are (1) partially or fully unemployed, or (2) unable and unavailable to work because: a. They have been diagnosed with COVID-19 or have symptoms of it and seeking diagnosis; b. A member of their household has been diagnosed with COVID-19; c. They are providing care for a family or household member diagnosed with COVID-19; d. A child or other person in the household for whom they have primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID-19 health emergency, and such school or facility care is required forthe individual to work; e. They cannot reach the place of employment because of a quarantine imposed as a direct

result of the COVID-19 health emergency; f. They were scheduled to start employment and do not have a job or cannot reach their place of employment as a result of the COVID-19 public health emergency; g. They have become the breadwinner or major support for a household because the head of household has died as a direct result of COVID-19; h. They had to quit their job as a direct result of the COVID-19 public health emergency; i. Their place of employment is closed as a direct result of the COVID-19 public health emergency; or j. They meet other criteria established by the Secretary of Labor.  (Pl.'s Verified Compl., RE#1, ¶29).

The CARES Act allows for substantial unemployment benefits for virtually every American directly or indirectly impacted by the Pandemic. (Pl.'s Verified Compl., RE#1, ¶30). Individuals who meet the above criteria will receive the weekly benefit as determined by their state for a maximum of 39 weeks, plus Pandemic Unemployment Compensation ("PUC") equal to $600 per week on top of the normal unemployment benefit. *Id.*  Individuals who were previously approved for unemployment benefits will continue to receive their weekly unemployment benefit for a maximum of 39 weeks. Since most states provide 26 weeks of unemployment benefits, the CARES Act effectively expands coverage for an additional 13 weeks.  *Id.*

One of the more notable "loopholes" of the CARES Act is the "windfall" received by many employees, where individuals actually receive higher wages through available unemployment benefits in comparison to their wages pre-Pandemic. (Pl.'s Verified Compl., RE#1, ¶31).  For example, if an employer places an employee on a reduced schedule, depending on the employee's rate of pay, he or she may receive a "windfall" by receiving PUC. *Id.*  That is, the employee may receive more through unemployment benefits than he or she would have at work. *Id.*  The CARES Act does not address whether a state has the authority to adjust PUC for

employees who are considered "partially unemployed" under state law.  *Id.*

A new analysis by Peter Ganong, Pascal Noel and Joseph Vavra, economists at the University of Chicago, uses government data from 2019 to estimate that 68% of unemployed workers who can receive tax-free benefits are eligible for payments that are greater than their lost earnings.[3] (Pl.'s Verified Compl., RE#1, ¶32).  They also found that the estimated median replacement rate – the share of a worker's original weekly salary that is being replaced by unemployment benefits – is 134%, or more than 1/3 above their original wage. *Id.*  A substantial minority of those workers, particularly in low-wage professions like food service and janitorial work, may end up receiving more than 150% of their previous weekly salary.  *Id.*

While the financial resources available to tenants impacted by COVID-19 abound, the remedies available to landlords and property owners are noticeably absent. (Pl.'s Verified Compl., RE#1, ¶33).  Landlords and property owners, like the GCNKAA's members, and the individual Plaintiffs are still responsible for paying mortgages, property taxes, utilities, security, managers, government-imposed fees, employee salaries, property maintenance costs, and a host of other expenses needed to maintain and operate their rental properties.  *Id.*

Defendant Hon. Andrew Beshear is the duly elected Governor of Kentucky.  (Pl.'s Verified Compl., RE#1, ¶34).  He is only sued in his official capacity.  *Id.*

Defendant Hon. John Middleton is the duly elected Circuit Clerk for the 16th Judicial District, which covers Kenton County.  (Pl.'s Verified Compl., RE#1, ¶35).  Defendant Hon. Tonya Nolan Jack is the duly elected Circuit Clerk for the 17th Judicial District, which covers Campbell County.  (Pl.'s Verified Compl., RE#1, ¶36).   Defendant Hon. David Martin is the duly elected Circuit Clerk for the 54th Judicial District, which covers Boone County.  (Pl.'s

---

[3] https://fivethirtyeight.com/features/many-americans-are-getting-more-moneyfrom-unemployment-than-they-were-from-their-jobs/ (last visited 7/6/2020)

Verified Compl., RE#1, ¶¶ 35-37).  The Circuit Clerks are empowered and charged with, under Ky. Const. 114, and K.R.S. 30A.010, as well as Kentucky Supreme Court orders, the receipt and filing of new matters.  *Id.*  Due to the No Eviction Orders, the Defendant Clerks have refused to accept new eviction filings for the non-payment of rent.  *Id.*  They are only sued in his official capacity.  *Id.*

Over two hundred years of Kentucky case law provide that a forcible entry and detainer action is a summary proceeding, designed to adjudicate the immediate right to present possession, and is a special statutory proceeding.  *Anthony v. McLaughlin*, 566 S.W.3d 581, 584 (2018); *Baker v. Ryan*, 967 S.W.2d 591, 592, 44 11 Ky. L. Summary 13 (Ky. App. 1997); *Shinkle v. Turner*, 496 S.W.3d 418, 422 (Ky. 2016) (emphasis in original) (*citing Bledsoe v. Leonhart*, 305 Ky. 707, 205 S.W.2d 483, 484 (1947); *Young v. Young*, 109 Ky. 123, 131-132 (1900); Pollard v. Otter, 34 Ky. 516, 517 (1836); *Doe ex dem. Gaines v. Buford*, 31 Ky. 481 (1833).  (Pl.'s Verified Compl., RE#1, ¶38).

Under Kentucky law, and Governor Beshear's statements in the executive orders notwithstanding, expiration of a valid 7-day notice for non-payment terminates the lease, and terminates the right to further rent.  *Pack v. Feuchtenberger*, 232 Ky. 267, 22 S.W.2d 914, 917 (Ky. 1929) ("[t]he notice to quit is technical, and is well understood; it fixes a time at which the tenant is bound to quit, and the landlord has a right to enter, and a time at which the rent terminates. The rights of both parties are fixed by it, and are dependent on it."); *Shinkle v. Turner*, 496 S.W.3d 418, 423-424 (2016).  Governor Beshear's declarations, then, deprive landlords, who are not entitled to rent because they have given the required 7-day notice, of the critical right to possession for a never-ending period of time.  (Pl.'s Verified Compl., RE#1, ¶39).  Defendants are empowered, charged with, and authorized to enforce and carry out the No

11

Eviction Orders.  (Pl.'s Verified Compl., RE#1, ¶40).  Moreover, Defendants actually do enforce and administer these laws and have enforced these laws to prevent the Plaintiffs from filing evictions for the non-payment of rent, even though such filings did not involve a CARES Act exemption.  *Id.*

**III.**   **Law and Argument**

A.  Temporary Restraining Order and Preliminary Injunction Standard

When deciding whether to issue a temporary restraining order or preliminary injunction, the court must consider the following four factors: (1) Whether the movant has demonstrated a strong likelihood of success on the merits;  (2) Whether the movant would suffer irreparable harm;  (3) Whether issuance would cause substantial harm to others; and  (4) Whether the public interest would be served by issuance.  *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).   These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

When analyzing a motion for temporary restraining order or preliminary injunction, "the 'likelihood of success' prong is the most important [factor]" and determinative in constitutional cases.  *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009); *see also Aristotle Pub. v. Brown*, 61 F. App'x 186, 188 (6th Cir. 2003).  The standards for preliminary injunctions and permanent injunctions are essentially the same, with the exception that for a permanent injunction the plaintiff must show actual success on the merits rather than the likelihood of success.  *ACLU of Ky. v. McCreary County, Ky.*, 607 F.3d 439, 445 (6th Cir. 2010).  With respect to the 'likelihood of success' prong, and because First Amendment rights are at issue, it is the Defendants, not Plaintiffs, who bear the burden of establishing the constitutionality of the challenged legislation.

*U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000).

    B.  <u>Plaintiffs have demonstrated a likelihood of success</u>

        1.  <u>Plaintiffs have demonstrated a likelihood of success on their Petition Clause claim</u>

      The First Amendment to the United States Supreme Court provides, in relevant part, that "Congress shall make no law …abridging the … right of the people … to petition the Government for a redress of grievances." It was incorporated against the states in 1937. *DeJonge v. Oregon*, 299 U.S. 353 (1937).

      "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-897 (1984); *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972); *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

      "The Petition Clause ... was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble." *McDonald v. Smith*, 472 U.S. 479, 485 (1985). And it is to be given the same constitutional protections as "other First Amendment expressions." *Id.*

      "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* "Because strict scrutiny applies either when a law is content based on its face, or when the purpose and justification for

the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 2228.  "Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. *Ibid.* For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* at 2229.

Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United v. Federal Election Comm'n*, 558 U. S. 310, 340 (2010), the Supreme Court has insisted that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658 (1994).  "Thus, a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based." *Reed*, 135 S. Ct. 2218, 2230.  Moreover, "characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Id.* at 2230-2231.

Even worse is viewpoint discrimination.  The Supreme Court articulated this principle in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828-829 (1995), observing that while "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and while "government regulation may not favor one speaker over another," that "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* Thus, "[v]iewpoint discrimination is thus an egregious form of content discrimination." *Id.* at 829.  "The government must abstain from regulating speech when the specific motivating

14

ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

*See, also, McCullen v. Coakley*, 573 U.S. 464, 484-485 (2014) (noting that permitting one class

of speakers to speak and not another raises questions of viewpoint discrimination).

Both content- and viewpoint-based discrimination are subject to strict scrutiny.

*McCullen*, 134 S. Ct. 2518, 2530, 2534 (2014). No state action that limits protected speech will

survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means

available to serve a compelling government interest. *United States v. Playboy Entm't Grp.*, 529

U.S. 803, 813 (2000).  *See, also, Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir.

2015).

The No Eviction Orders do not suspend all court filings or suspend the petition rights of

all speakers; the tenants are free to sue the landlords for any and all causes of action, including

failure to abide by each and every obligation in the leases; they instead restrict only the

landlord's rights to petition only, constituting not merely a content based discrimination, but a

viewpoint based discrimination.  They are thus subject to strict scrutiny.

The No Eviction Orders are not narrowly tailored; less restrictive means to vindicate any

state interest in preventing a flood of evictions and homelessness related to COVID-19 exist: the

government could instead have: (a) required tenants to make a showing that they are unable to

pay due to COVID-19; (b) required tenants to make partial payments to avoid evictions if they

are able to do so; (c) required tenants to seek housing related community resources or

demonstrate a best efforts to pay to avoid eviction; or (d) required tenants and landlords to meet

and confer prior to bringing suit for eviction.  Any or all of those lesser options would have

likely vindicated the Government's interest.

The No Eviction Orders are unconstitutional under the Petition Clause.  *ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2020 WL 2198366 (D. Mass. May 6, 2020).

2.   Plaintiffs have demonstrated a likelihood of success on their Contracts Clause claim

Article 1, Section 10, Clause 1 of the United States Constitution provides, in relevant part, that "No State shall … pass any … Law impairing the Obligation of Contracts…".  Almost 200 years ago, the United States Supreme Court had occasion to take up the question of whether Kentucky could protect its residents who were tenants, against landowners in Virginia, by precluding them from filing evictions where the tenants improved the property.  *Green v. Biddle*, 21 U.S. 1 (1823).  In *Green*, the Supreme Court observed that: "[a] right of property necessarily includes the right to recover the possession, to enter, to enjoy the rents and profits, and to continue to possess undisturbed by others."  *Id.* at 20.  "He who has a right to land, and is in possession, has a right to be maintained in that possession, and in the use of the land and its fruits; and he who has a right to land, but is out of possession, has a right to recover the possession or seisin."  *Id.*

The *Green* Court also concluded that: "[n]othing, in short, can be more clear, upon principles of law and reason, than that a law which denies to the owner of land a remedy to recover the possession of it, when withheld by any person, however innocently he may have obtained it; or to recover the profits received from it by the occupant; or which clogs his recovery of such possession  and profits, by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to, and interest in, the property."  *Id.* at 75-76.  "If there be no remedy to recover the possession, the law necessarily presumes a want of right to it."  *Id.* "If the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist, and be acknowledged, but it is impaired, and rendered

16

insecure, according to the nature and extent of such restrictions." *Id.* "A right to land essentially implies a right to the profits accruing from it, since, without the latter, the former can be of no value." Id. "Thus, a devise of the profits of land, or even a grant of them, will pass a right to the land itself. (Shep. Touch. 93. Co. Litt. 4 b.) 'For what,' says Lord Coke, in this page, 'is the land, but the profits thereof.'" *Id.*

"The objection to a law, on the ground of its impairing the obligation of a contract, can never depend upon the extent of the change which the law effects in it." *Id.* at 84. "Any deviation from its terms, by postponing, or accelerating, the period of performance which it prescribes, imposing conditions not expressed in the contract, or dispensing with the performance of those which are, however minute, or apparently immaterial, in their effect upon the contract of the parties, impairs its obligation." *Id.* "Upon this principle it is, that if a creditor agree with his debtor to postpone the day of payment, or in any other way to change the terms of the contract, without the consent of the surety, the latter is discharged, although the change was for his advantage." *Id.* at 85. The Court thus found that the Kentucky law at issue violated Article 1, Section 10, Clause 1 of the United States Constitution – the Contracts Clause.

The Supreme Court has found that laws that delay remedies, such as those at issue in this matter, violate the Contracts Clause of Article 1, Section 10, Clause 1 of the United States Constitution. *Bronson v. Kinzie*, 42 U.S. 311 (1843).[4]

Notwithstanding written contracts with their tenants that expressly provided that Plaintiffs would have immediate possession of their property in the event of a default for non-payment of rent, with seven days' notice to cure, Defendants have retroactively impaired this

---

[4] It should be made clear that the No Eviction Orders do not, for instance, merely contain a provision that freezes rent, or waives late fees, or requires the tenants to continue to pay "reasonable rent" as determined by a Court, if the tenants suffer a COVID-19 related financial setback.

material and essential obligation of the contractual rights of Plaintiffs. At the same time, Kentucky law terminated the right to rent at the time the 7-day notices require. Essentially, the No Eviction Orders have left the landlords high and dry. This is unconstitutional.

3. <u>Plaintiffs have demonstrated a likelihood of success on their Equal Protection claim</u>

Because the No Eviction Orders violate and impair fundamental rights, including, without limitation, the right to Petition, the right against the impairment of contracts, and procedural due process, they are a violation of the Equal Protection Clause of the Fourteenth Amendment, and subject to strict scrutiny. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973). Because they are not narrowly tailored, they violate the Constitution.

4. <u>Plaintiffs have demonstrated a likelihood of success on their Procedural Due Process claim</u>

"[T]here can be no doubt that at a minimum [procedural due process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process...." *Carey v. Piphus*, 435 U.S. 247, 259 (1978) (*citing Mathews v. Eldridge*, 424 U.S. 319, 344 (1976)).

At its core, procedural due process requires "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015).

Plaintiffs have a property interest in their rental properties, including the right to possession in the event their tenants fail to pay rent. They were deprived of these property interests by the No Eviction Orders. And the No Eviction Orders preclude them from vindicating these property interests. Defendants' actions foreclosed Plaintiffs from filing suit in state court and/or rendered ineffective any state court remedy she previously may have had. *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997).

The No Eviction Orders deprive Plaintiffs of procedural due process, forestalling claims for possession of their property indefinitely.

5. <u>Plaintiffs have demonstrated a likelihood of success on their Substantive Due Process claim</u>

The No Eviction Orders are arbitrary and capricious; they permit tenants to sue landlords, permit landlords to sue tenants whose term of lease ends, but simultaneously prohibit non-payment of rent evictions, without any showing that a tenant is actually unable to pay rent, or even whether the tenant is suffering a hardship. These orders are fundamentally a value judgment that landlords' rights have no meaning, forcing these landlords to subsidize their tenants, regardless of whether or not the tenants actually have a COVID-19 hardship. These No Eviction Orders are arbitrary and capricious government action that have deprived Plaintiffs of a constitutionally protected property interest. *Warren v. City of Athens*, 411 F.3d 697, 707 (6th Cir. 2005).

C. <u>The other factors are also met</u>

"Preliminary injunctions in constitutional cases often turn on likelihood of success on the

merits, usually making it unnecessary to dwell on the remaining three factors." *Roberts v. Neace*, 958 F.3d 409, 2020 U.S. App. LEXIS 14933 (6th Cir. 2020)   Given these circumstances, "no one can fairly doubt that time is of the essence." *Maryville Baptist Church, Inc. v. Beshear*, 2020 U.S. App. LEXIS 14213.  *See, also, Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights); *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake). "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

### D.  <u>Conclusion</u>

The temporary restraining order and/or preliminary injunction should be granted.

Respectfully submitted,

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/ Alexander F. Edmondson
Alexander F. Edmondson (88406)
EDMONDSON & ASSOCIATES
28 West Fifth Street
Covington, KY 41011
859-491-5551 tel
859-491-0187 fax
aedmondson@edmondsonlaw.com
*Co-Counsel for Plaintiffs*

20

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing, by express overnight mail, along with the Complaint and Summons, this 7 day of July, 2020, upon each of the Defendants, and have filed a copy of the foregoing in the Court's CM/ECF system, and have served a copy by email of this to the Defendants or their counsel the 8 day of July, 2020.

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)