UNITED STATE DISTRICT COURT
EASTER DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 20-96-DLB-CJS

GREATER CINCINNATI NORTHERN
KENTUCKY APARTMENT ASSOCIATION, et al.                    PLAINTIFFS

v.

JOHN C. MIDDLETON, in his official capacity
as Circuit Clerk for the 16th Judicial Division, et al.    DEFENDANTS

# Memorandum of Law of Amici Curiae

## Introduction

The Plaintiffs seek an injunction from this Court that would subject hundreds of thousands of Kentuckians to set-outs following a district court's eviction order in any one of Kentucky's 120 counties.[1] These Plaintiffs have a heavy burden to bear to get such extraordinary relief. They must establish that:

- they are "likely to succeed on the merits,"
- they are "likely to suffer irreparable harm in the absence of preliminary relief," *and*
- that "the balance of equities tips in [their] favor."

Finally, having prevailed on each of those factors with actual proof, they must show "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).

1. **In the face of a known, immediate, unprecedented, and spiraling threat to public health and safety, Plaintiffs have provided no proof of irreparable harm to support their extraordinary request.**

When deciding whether Plaintiffs have met these weighty questions with proof to satisfy the Court that they are worthy of sweeping relief at this early stage in litigation, the Court must

---

[1] Plaintiffs request relief from this Court "only" in Kenton, Boone, and Campbell County, Kentucky's third, fourth, and eighth most populous counties, respectively. Plaintiffs' Emergency Motion, p. 1. Population data at https://en.wikipedia.org/wiki/List_of_counties_in_Kentucky. Meanwhile, the parties, the Court, and *amici* know well that this Court's decision regarding preliminary relief in "only" three counties will ultimately impact Kentuckians regardless of what county they happen to call home.

confront the unavoidable, widely-known, dangerous and deadly facts[2] about the moment in which we find ourselves and contrast those with the paucity of proof Plaintiffs have provided to the Court of their own harms. The following questions will be relevant to the Court's flexible exercise balancing harms and equities:

- What harms have the Plaintiffs proven they will suffer without preliminary relief from the Court?
- What concessions, programs, or accommodations are available to Plaintiffs in the time of COVID–19?
- What have the Plaintiffs done to mitigate any harm they face going forward? What steps have they taken to alleviate their own financial hardship to date?
- Relatedly, what remedies are still available to landlords through the court system to help them avoid harm? Have they availed themselves of those remedies?
- What is likely to occur if landlords across Kentucky are allowed to set-out homerenters during a global pandemic? How many people will likely be affected? In what ways will those people be affected?

Taken holistically, as will be discussed below, Courts have unanimously declined to provide landlords the kind of relief Plaintiffs seek here *in every jurisdiction which has decided the question*. The question (not a close question) is even more easily answered because the Plaintiffs have brought no proof that would support a finding of irreparable harm to the Court, much less proof of harm that would outweigh the catastrophic, exponential harm of an eviction crisis on top of an ongoing global pandemic and economic crisis.

---

[2] The facts regarding the novel coronavirus, SARS-CoV-2, are widely known and of which it would be appropriate for the Court to simply take judicial notice. It is a deadly, highly contagious, never-before-seen virus. Many who are fortunate enough to survive it are left with damage to heart, brain, and (of course) lung tissue and other likely permanent conditions. As reported in *Science* on April 17, "'[The disease] can attack almost anything in the body with devastating consequences,' says cardiologist Harlan Krumholz of Yale University and Yale-New Haven Hospital, who is leading multiple efforts to gather clinical data on COVID-19. 'Its ferocity is breathtaking and humbling.'" "How does coronavirus kill? Clinicians trace a ferocious rampage through the body from brain to toes" at https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes.

Already, more than 157,000 Americans have not been lucky enough to survive COVID-19 and each day, more than 1,000 more Americans die as a result of our collective inability/unwillingness to do what it takes to control its spread. https://covidtracking.com/data

In stark contrast to the known dangers—biological, sociological, economic—of SARS-CoV-2, the Plaintiffs come to Court complaining vaguely of "several"[3] tenants who will not pay rent despite their (alleged) ability to pay. In this action, Plaintiffs have not:

- named those tenants,
- numbered those tenants,
- proven those tenants have the ability to pay,
- articulated the steps they have taken to avoid experiencing financial hardship themselves in this extraordinary moment,
- provided any proof whatsoever that they are experiencing any actual hardship.[4]

Of course, proof of actual hardship is necessary to prevail in a Motion for Temporary Injunction: it is *Plaintiffs' burden* to prove they will be "irreparably harmed" without preliminary relief from the Court. Here, the only hardship *amici* can discern from Plaintiffs' pleadings is the vague, unsubstantiated allegation that "GCNKAA members have apartments and other rental properties in Kenton, Campbell, and Boone Counties who have been adversely impacted by the challenged orders and which have adversely impacted the GCNKAA as it deprives the GCNKAA membership of resources that are otherwise paid toward member dues." Member.

---

[3] Plaintiffs' Complaint, ¶¶ 15, 19, and 22.

[4] This is not to suggest that Plaintiffs are not experiencing actual hardship. Rather, simply to say that they have not *produced* any evidence of such hardship in support of their motion for injunctive relief.

As an Illinois court recently said in *JL Properties Group B LLC et al. v. Pritzker*, "This opinion should not be read to minimize the significant harm that has likely been inflicted on Plaintiffs. Housing providers are not immune from the economic havoc that COVID-19 has wreaked in this state, and across the country. Having once been a small business landlord, the undersigned is sympathetic to Plaintiffs' struggles. While the Court acknowledges the economic devastation to Plaintiffs, however, the balance of harm tips substantially in the Governor's favor. This is true on all ten of the asserted claims. Indeed, as to each count, even if Plaintiffs established the elements of their claims and had a reasonable likelihood of success on the merits, a balancing of harms would necessitate denial of an injunction." JL Properties Group B LLC et al. v. Pritzker, Will County Circuit Court (Ill.) 20-CH-601, pp. 45-46.

Note that while the Court in *JL Properties Group B LLC* found the landlords had "likely" suffered "significant harm" and "acknowledge[d] the economic *devastation* to Plaintiffs", the Court found that the public interest and equities would *still* require denying the landlords' request for injunctive relief *even if they had showed they would likely win*.

Meanwhile, in this case before this Court, Plaintiffs have provided no actual evidence to support a finding that the nonpayment of these "several" tenants have harmed or will harm the Plaintiffs in any way, much less that they have suffered "significant harm" or "economic devastation."

Dues.[5] The individual landlord Plaintiffs, meanwhile, provide no evidence that nonpayment from the "several" residents who "literally[6] have thumbed their noses"[7] at Plaintiffs has materially harmed them in the slightest.

With no evidence of actual harm, the Plaintiffs cannot show irreparable harm and certainly cannot prevail when balancing the equities between a claimed-but-unsubstantiated injury and the very real actual injuries—pecuniary and physical—that would flow if the Court were to allow Kentuckians to be set-out during a global pandemic. While *amici*'s brief will provide information to the Court regarding the equities and public interests at stake, the Court's analysis of Plaintiffs' Motion for Injunctive Relief can begin and end with the Plaintiffs' failure to support their request for extraordinary relief with any actual evidence of the harm they have experienced or will experience.

2. **The Courts never "closed to landlords for the nonpayment of rent."**

The very first sentence of the very first page of Plaintiffs' Complaint (and nearly identical Motion for Temporary Injunction) contains a gross mischaracterization of the effect of the Defendants' actions and orders on landlords. Plaintiffs claim, "This action challenges Kentucky Governor Andrew Beshear's closing of Kentucky Courts to landlords for nonpayment of rent, while leaving those same courts open for tenants to sue landlords…." Plaintiffs' Complaint, ¶ 1.[8]

Here's the truth: *not a single Order or action by the Defendants impaired Plaintiffs' ability to file collections actions for breach of contract against the "several" homerenters Plaintiffs complain refuse*

---

[5] It bears noting here that even this allegation of loss of member dues is not supported by any numbers or other facts that would allow the Court to discern the *amount* of harm Plaintiff GCNKAA has suffered as a result of the member dues it has lost.

[6] Not literally.

[7] Plaintiffs' Complaint, ¶ 1.

[8] As a procedural matter, it is not clear why one of the Plaintiffs, Anduril Strategy, LLC, is continuing to collect rent, attempt to file eviction actions, and conduct business in the Commonwealth. Anduril Strategy, LLC is a business in [bad standing and "pending dissolution"](https://web.sos.ky.gov/ftsearch/) according to the Secretary of State's records available at https://web.sos.ky.gov/ftsearch/.

"An entity administratively dissolved continues its existence but shall not carry on any business except that necessary to wind up and liquidate its business and affairs." K.R.S. 14A.7-020(3)

4

*to pay rent*. Such an action is the appropriate—and only—action that would result in Plaintiffs getting a money judgment against these nose-thumbing renters: a forcible detainer complaint only determines the parties' right to possession of the premises. In this summary proceeding, courts *cannot* issue a money judgment against a party. Again, at any time during the last five months (and even today), Plaintiffs can file actions in any small claims court, district court, or circuit court in the Commonwealth.

So, when Plaintiffs complain that Governor Beshear's Orders are "not narrowly tailored" because they didn't "require[] tenants to make a showing they are unable to pay due to COVID-19"[9] or some other proposal, Plaintiffs ignore the fact that Defendants' Orders left in place the one legitimate avenue Plaintiffs have to collect money damages against a non-paying homerenter: a collections action. Governor Beshear did not *need* to impose on the Courts and the litigants some pre-litigation hoops-jumping exercise to means-test a person's ability to pay: that process already exists: a collection action.

The answer to Plaintiffs' whining over nonpaying renters isn't a federal lawsuit challenging the constitutionality of the emergency measures the Governor and the Kentucky Supreme Court put in place to protect everyone during an emerging pandemic. The answer to nonpayment is a simple breach of contract claim. File it! Get a money judgment! File a wage garnishment! Sweep a bank account! If the judgment debtor doesn't have the ability to pay the judgment, he or she can object to the garnishment and a judge can determine the debtors' ability to pay. That process already exists. It's been open to the Plaintiffs this entire time.

If Plaintiffs had devoted 10% of the energy they've devoted to this case to filing routine breach of contract claims, they'd be garnishing those "several" renters' wages right now. Kentucky is a very creditor-friendly state. Last year, the National Consumer Law Center graded each state based on the basic protections each state has in place to protect debtors from aggressive

---

[9] Plaintiffs' Complaint at ¶ 52.

or abusive creditors.[10] Kentucky was one of five states to earn an "F" grade. In Kentucky, creditors can garnish any wages in excess of $217.50/week. They can sweep the entire contents of a debtors' bank account.

**Plaintiffs' claim that Defendants' "clos[ed] the Courts to landlords for the non-payment of rent" is simply false.**[11] The only proper remedy in Kentucky to recover unpaid rent is filing a collection action. Nothing in Defendants' Orders ever impeded Plaintiffs' ability to file breach of contract claims and execute upon the judgments they could have received if they had only availed themselves of that ever-present option.

Yes, Governor Beshear's Orders prohibit law enforcement from setting out Kentuckians following the adjudication of a forcible detainer complaint. Yes, based on the obvious public health threat of conducting crowded eviction dockets during a pandemic, the logistical challenges of providing remote proceedings that satisfied due process concerns, and Governor Beshear's Executive Orders, the Kentucky Supreme Court justifiably suspended for a period of time the filing of forcible detainer actions.[12] The Kentucky Supreme Court has now completely lifted (over *amici*'s bitter objections) those restrictions.

So, it would be accurate to say that Governor Beshear's Orders have impeded landlords' ability to gain physical possession of their rental property during a global pandemic. It would be accurate to say that the Kentucky Supreme Court temporarily suspended landlords' ability to prosecute cases to recover physical possession of their rental property during a global pandemic. As discussed below, courts across the country have found measures like these to be appropriate responses to an emerging threat. Such an outcome is especially obvious when, as here, the Orders

---

[10] "No Fresh Start: How States Still Allow Debt Collectors to Push Families into Poverty" at http://bit.ly/rpt-no-fresh-start. Kentucky's provisions are in the "State Summaries" in Appendix G.

[11] Likewise, the implication that the Kentucky Supreme Court "le[ft] those same courts open [only] for tenants to sue landlords" while landlords had no access to the court is also false. See, Plaintiffs' Complaint at ¶ 1. Both sides had equal access to the courts to sue and be sued.

[12] Additionally, each party has the right to a jury trial in a forcible detainer action. It is nonsense to allow forcible detainer actions to proceed at a time when the court system is still grappling with how to safely and fairly provide litigants the right to a trial by jury. The Kentucky Supreme Court was right to suspend eviction filings and should have kept that sensible restriction in place longer.

1) explicitly said that nothing in the Governor's Orders obviates a renters' obligation to pay rent and 2) nothing in the Defendants' Orders impedes a landlord from filing a breach of contract claim to recover the money it is owed.

Instead, the Landlord-Plaintiffs here want the power to evict because they view it as a more *efficient* way to extract money from people. Because money damages are not a remedy a Plaintiff can receive in a forcible detainer action, *amici* believe using a forcible detainer action as a means to collect money borders on abuse of process. Plaintiffs complain of willful nonpayment of rent. Fine: there is a court-provided remedy available to them *right now* that they can use to protect themselves from financial harm. Using eviction as a collection tool is like using a medication for an off-label use: it may be effective for that purpose, but it wasn't designed for that purpose and a doctor is certainly under no obligation to prescribe it for that purpose. No provision in the Constitution guarantees businesses access to the most efficient methods of extracting money from their customers, access to the sharpest tool in the shed with which they can threaten debtors. Especially in times like these.

3. **Courts across the country find eviction moratoriums reasonable, necessary responses to global pandemic and concomitant economic crisis.**

Governors and mayors and courts and city councils across the country have issued orders protecting renters from eviction during the ongoing coronavirus pandemic. Landlords have challenged these protections in various jurisdictions. Five courts have ruled on the constitutionality of the restrictions on evictions.

All five Courts denied the landlords' request for immediate relief from those emergency measures elected officials have taken to protect the public. These officials, courts find, are acting on "an emergent problem…to which swift and urgent attention was required." Arizona Order, p. 3.

| Location | Court | Outcome |
| --- | --- | --- |
| New York | United States District Court, Southern District of New York | Court denied landlords' motion for summary judgment; granted Governor's motion for summary judgment; dismissed action. Order |
| Connecticut | United States District Court, District of Connecticut | Court denied landlords' motions for temporary restraining order or preliminary injunction stating, "Plaintiffs have failed to satisfy the standards necessary…as a matter of law." Order, p.39. |
| Arizona | Superior Court of Arizona, Maricopa County | Court denied landlords' request for mandamus relief from Governor's eviction moratorium, finding the eviction restrictions "substantial[ly] advanc[ed a] legitimate state interest." Order, p. 9. |
| Illinois | Will County Circuit Court, 12th Division | Court denied landlords' motion for preliminary injunction, dismissing certain claims and finding that "the balance of equities tilts strongly in favor of the public's and State's interest in preserving public health for all." Order, p. 45. |
| San Francisco | Superior Court of the State of California, County of San Francisco | Court denied landlords' motion for peremptory write of mandate because the city ordinance was a "reasonable exercise of police power to promote public welfare." Order, p. 2. |

*No court in America has struck down restrictions placed on landlords during our ongoing pandemic and economic crisis as unconstitutional, as Executive overreach, or for some other reason.* Instead, each court that has considered the various issues raised by landlords has easily found that the disastrous consequences of allowing homerenters to be evicted from their homes during a pandemic outweigh the relatively modest restrictions placed on landlords during this perilous time.[13]

This Court should do the same (and fast) because this litigation has placed the lives of hundreds of thousands of Kentuckians' lives in limbo—not knowing whether they and their families will be able to stay #HealthyAtHome next week or whether they and their things will be set out on the street if they have nowhere else to go.

---

[13] Of course, *amici* do not suggest that this Court uphold the legality of the Governor and Supreme Court's actions taken to mitigate the spread of SARS-CoV-2 simply because the courts that have considered the question are in unanimous agreement. Rather, amici urge the Court to review the detailed, painstaking analysis in the other courts' Orders and find, as they did, that the limited restrictions imposed on landlords in Kentucky during an emergency are reasonable, measured, appropriate responses to a novel and highly contagious virus that affects the body in ways we are only beginning to understand. Find, as the other courts have, that the clear public interest in physical health, bodily integrity, and housing stability easily outweighs landlords' interest in physical possession of their rental property.

## 4. Governments have provided significant relief to landlords during this crisis.

Reading the landlords' Complaint and statements to the media[14], the Court might be under the impression that every level of government has forgotten or ignored the needs of oppressed landlords during this pandemic. Plaintiffs complain they are "still responsible for paying mortgages, property taxes, utilities, security, managers, government-imposed fees, employee salaries, property maintenance costs, and a host of other [unnamed] expenses…." Plaintiffs' Complaint, p. 12, ¶ 34. In fact, governments across the country at every level have passed laws, created programs, and issued orders to assist landlords during this time. These measures are relevant to the Court's obligation to measure the balance of the equities, assess the nature and likelihood of Plaintiffs' harm, and consider the public interest(s) at stake.

**Mortgage Loans**

The CARES Act allows any borrower with a mortgage backed by a government-sponsored entity (GSE) like Fannie Mae or Freddie Mac to receive a 180-day mortgage forbearance from their mortgage servicer.[15] 25% of all residential mortgages are backed by a GSE. Borrowers may renew the forbearance period for an additional 180 days. The program is not limited to owner-occupied homes; it is available to landlords, as well. The Urban Institute estimates that the federal moratorium covers over one quarter of all rental units in the U.S. and almost half of all multifamily rental units.[16] The actual figure is higher, because the Urban Institute estimate does not include units in Low Income Housing Tax Credit properties, rent subsidy programs like

---

[14] See, for example, this statement to Spectrum News by Plaintiffs' counsel, Chris Weist: "The landlord bills don't stop right. The states still want their tax money, the states still want their utility money, the mortgage companies still want their money…"

[15] CARES Act § 4023 available at: https://library.nclc.org/sec-4023-forbearance-residential-mortgage-loan-payments-multifamily-properties-federally-backed. And, see generally, "Learn about mortgage relief options and protections" at https://www.consumerfinance.gov/coronavirus/mortgage-and-housing-assistance/mortgage-relief/

[16] See Laurie Goodman, Karan Kaul & Michael Neal, *The CARES Act Eviction Moratorium Covers All Federally Financed Rentals--That's One in Four US Rental Units*, Urb. Inst. (Apr. 2, 2020), available at https://www.urban.org/urban-wire/cares-act-eviction-moratorium-covers-all-federally-financed-rentals-thats-one-four-us-rental-units.

Section 8, and public housing.[17] The multifamily mortgages are eligible for up to six months of mortgage forbearance.[18]

How many members of the GCNKAA are currently benefitting from mortgage payment forbearances available to them as a part of the CARES Act? As an organization representing the owners of "more than 100,000 apartment homes" in northern Kentucky, the numbers would suggest that the mortgages on at least half of the multifamily dwellings owned by its members are eligible for mortgage forbearance. Complaint, ¶ 11. GCNKAA claims that its membership is "routinely adversely affected by the No Eviction Orders" but does not mention the availability of mortgage forbearance to its members under the CARES Act or the rates at which its members have availed themselves of this relief.[19]

Even if these CARES Act-based programs are unavailable to the three landlords in this case, these companies are clearly sophisticated businesses with access to attorneys. They have the capacity to negotiate a loan modification or forbearance with their lenders during this time. Advice on how to proceed is freely available on the internet.[20] In any event, no evidence is in the record as to what steps, if any, Plaintiffs have taken to reduce or renegotiate with their creditors their own mortgage payments in the last five months.

**Utilities**

Utility bills are among the bills Plaintiffs grouse that they are still obligated to pay to support their claim that Kentucky's Governor and Supreme Court's actions have imposed a deep

---

[17] *Id*. ("Our estimates only cover federally financed units in single-family and multifamily properties and exclude units covered by LIHTC, federal assistance or voucher programs.").

[18] See, "Freddie Mac, Fannie Mae Extend Multifamily Forbearance, Offer Relief to Landlords and Renters," at https://www.forbes.com/sites/dimawilliams/2020/06/29/freddie-mac-fannie-mae-extend-multifamily-forbearance-offer-relief-to-landlords-and-renters/#70ca77238473

[19] Indeed, Plaintiffs provide no numbers to provide the Court some sense of the scope and scale of the Plaintiffs' claimed injuries. Instead, GCNKAA says the Defendants' actions affect "numerous members". Complaint, ¶ 12. The individual Plaintiffs only claim that each have "several tenants" who refuse to pay. Complaint ¶¶ 15, 19, and 22. Is the Court to strike down important, necessary protections for renters across the Commonwealth because of three landlords' "several" obstinate tenants?

[20] See, for example, "Issues Facing Commercial Mortgage Lenders in the COVID-19 Pandemic" at https://www.natlawreview.com/article/issues-facing-commercial-mortgage-lenders-covid-19-pandemic.

hardship on them. "The states still want their utility money," they say.[21] Yet, Governor Beshear's own May 8th Executive Order suspends all "disconnections due to non-payment *by all entities* that provide natural gas, water, wastewater, or electric utility service within the Commonwealth." [Executive Order 2020-323](), ¶ 6. Now, just like Governor Beshear's Executive Orders explicitly never relieve homerenters from their obligation to pay rent, Governor Beshear's Executive Order prohibiting utility shutoffs does not "reliev[e] any individual of the obligation to pay for a utility service provided." However, Plaintiffs cannot (with any intellectual consistency, anyway) support a claim of hardship imposed on them by Governor Beshear's restrictions on evictions by complaining that they still have to pay utility bills when the same Executive Order they're suing over also temporarily removes the consequences of landlords failing to pay those utility bills.[22]

**Property Taxes**

Similarly, the Plaintiffs complain they are "still responsible for paying …property taxes" because "the states still want their tax money." *See* Plaintiffs' Complaint at ¶ 34, Weist at fn. 2. In fact, property taxes are not "due" to the state until November 2 and are not delinquent until January 1 of the following year.[23] Plaintiffs' complaint that the Commonwealth has not reduced or forbore property tax obligations not due until November sounds about as rational as a child complaining they have received no Christmas presents in July. It is not a serious complaint.

**Payroll and Lost Rents**

Plaintiffs also complain that they are still obligated to pay "employee salaries" while somehow omitting the fact that the federal government created the Payroll Protection Program as part of the CARES Act.[24] This program, administered by the Small Business Administration, has

---

[21] See Plaintiffs' counsel's [statement to Spectrum News]().

[22] Perhaps Plaintiffs did not know about the protections related to utility shut-offs before now? That would be one way to explain including the need to pay utilities immediately as one of the hardships imposed upon them by the Governor's restrictions on evictions.

[23] See, generally, Kentucky's property tax calendar at https://revenue.ky.gov/Property/Pages/TheCollectionProcessforPropertyTaxBills.aspx

[24] Once again, Plaintiffs' complaints are not supported by any actual evidence of what their monthly payroll obligations are, what their decline in revenue has been, the loans they have needed to take to make payroll. No evidence of actual hardship.

delivered more than $350,000,000,000 to small businesses across the country to help them cover payroll during the pandemic.[25] The program is available to any company with fewer than 500 employees and allows employers to receive a loan in an amount equal to 2.5 months of the company's monthly payroll. Amounts spent on 1) payroll, 2) mortgage payments, and 3) utilities over a 24-week loan period are *fully forgivable*. The Plaintiffs do not mention the availability of the Paycheck Protection Program in their Complaint or Motion for Temporary Injunction. Nor do they mention whether they received any PPP loans or even whether they attempted to take advantage of this program that was set up to assist businesses like them.

      Simultaneously, a different CARES Act program—the Economic Injury Disaster Loan (EIDL)—is also available to landlords to help those businesses suffering an economic injury as a result of the pandemic. In applying for this program, the SBA explicitly asks landlords to identify "Lost Rents Due to the Disaster."[26]

**Gross Revenues for the Twelve(12) Month Prior to the Date of the Disaster (January 31, 2020)** *

**Cost of Goods Sold for the Twelve(12) Month Prior to the Date of the Disaster (January 31, 2020)** *

**Rental Properties (Residential and Commercial) Only - Lost Rents Due to the Disaster**

Loans up to the first $10,000 made through the EIDL program do not need to be repaid. After that, the loans carry 3.75% interest (an extremely low interest rate for a commercial loan) over a thirty-year repayment period with the first payment deferred for a year.[27]

      Did the Plaintiffs in this case apply for and receive any PPP or EIDL loans? If so, why are they complaining about not being able to evict people when they received assistance from the government to make their ends meet while people's lives were turned upside down by an

---

[25] See, generally, Paycheck Protection Program at https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program.

[26] See the second page of the Streamlined Process Requirements at https://covid19relief.sba.gov/#/.

[27] See, Overview at https://www.sba.gov/funding-programs/disaster-assistance/coronavirus-covid-19

unprecedented pandemic and unemployment crisis? If not, why are they complaining about not being able to evict people when they didn't even try to receive assistance from the government to make their ends meet while people's lives were turned upside down by an unprecedented pandemic and unemployment crisis?

Without providing any financial details, the Plaintiffs also complain of ongoing fees to property management companies. Landlords who structure their businesses so as to rely on management companies rather than their own employees have a similar obligation to be in conversation with those management companies who *do* have employees and are eligible for Payroll Protection Program loans. Landlords using management companies that are receiving what is essentially free government money can rightfully expect a discount on their management fees for the duration of the government benefit. If Plaintiffs failed to negotiate those reductions, that is not the Court's problem, nor should it be made the problem of Kentuckians who rent their homes by allowing Plaintiffs to take a flop on the soccer field and complain of rough treatment from the government.

### Unemployment Benefits

Far from assistance to landlords being "noticeably absent"[28] during the pandemic, the laws passed and orders issued (by Defendant Beshear himself) made multiple avenues of relief available to landlords during this difficult time. (These measures are beyond the self-help options available to Plaintiffs—sophisticated businesses with access to bankers, advisers, and counsel—that they are more than capable of pursuing.) Failing to mention the availability of mortgage forbearance under the CARES Act to roughly 50% of the GCNKAA's members[29], remaining silent about the Paycheck Protection Program, pretending that Governor Beshear had not prohibited shutting off utilities if Plaintiffs or its members could not pay them during a pandemic —these omissions strain the Plaintiffs' duty of candor to the Court.

---

[28] Plaintiffs' Complaint, ¶ 34

[29] Assuming 50% of multifamily mortgages are backed by a GSE.

Perhaps most galling, however, is the attention Plaintiffs devote to expanded unemployment insurance benefits and their attempt to frame those benefits as *exclusively assistance to renters—as though Plaintiffs themselves have not benefitted mightily from the federal government's decision to expand the categories of eligibility and increase the amounts paid to Americans forced to stay home, whether home is rented or owned, during a global pandemic*. Plaintiffs devote seven paragraphs (4 of the 12 pages of their factual allegations) in their Complaint to 1) describe the unemployment insurance programs, 2) take a detour for a few of those paragraphs to offer some criticism of the structure of the program, and 3) hand-wring about the "loopholes" that might allow low-wage workers to receive "windfalls" during a global pandemic. Complaint, ¶¶28-33. Then, in a single paragraph (¶34), they attempt to contrast the assistance available to homerenters (which "abound") with the "noticeably absent" help available to landlords.[30]

Plaintiffs' rhetorical legerdemain attempts to elide past the rather obvious fact that the federal government's decision to expand unemployment benefits is one of the primary reasons many homerenters are able to pay their rent at all. It's the reason Plaintiffs only have a problem of nonpayment with "several" of their homerenters, rather than "most." The Urban Institute estimated in July that approximately 6 million homerenters live in a household that experienced a job loss during the pandemic.[31] The researchers found that the expanded benefits offered to Americans unable to work because of the pandemic kept the number of rent-burdened households "stable" at 2.4 million. "With no benefit, that number would have climbed as high as 4.6 million," they said. And, the $600/week benefit prevented almost 1.5 million households from

---

[30] Plaintiffs devote zero paragraphs to the well-documented problems Kentuckians have had in actually accessing these "abounding" benefits. A July 20, 2020 report from WFPL said that more than 68,000 Kentuckians were still waiting on their claims to be resolved—5,000 have been waiting since March. "Well-Connected Kentucky Unemployment Director Quietly Fired Amid Crisis" at https://wfpl.org/kycir-well-connected-unemployment-director-quietly-fired-amid-crisis/ For many Kentuckians, unemployment insurance benefits feel less like a "windfall" and more like a shove down the stairs.

[31] "Reducing the Amount of Federal Unemployment Insurance Would Increase Rent Burden for Millions of Households" at https://urbn.is/3g9ouTa.

joining the 1.2 million Americans who are currently spending *more than 50% of their monthly income* on rent.[32]

Number of Recently Unemployed Renter Households Paying More Than 50 Percent of Income on Rent



Source: Sarah Strochak, "How Much Assistance Is Needed to Help Renters Impacted by COVID-19?" (Washington, DC: Urban Institute, 2020).

URBAN INSTITUTE

If this lawsuit were actually about avoiding financial hardship rather than scoring political points, it wouldn't be a lawsuit at all: Plaintiffs would be spending their time instead lobbying Kentucky's federal delegation to extend the $600/week across-the-board increase in benefits under the Federal Pandemic Unemployment Compensation (FPUC) program. These payments are as much a benefit to these landlords as they are to the laid-off Kentuckians who receive it.[33] Those enhanced payments expired on July 31; the end of those payments (especially while there are 14 million more unemployed people than jobs available[34]) poses a graver threat to Plaintiffs'

---

[32] *Id*. The Urban Institute notes that spending more than 30% of a household's monthly income on rent is the "generally accepted threshold" for housing affordability. *Amici* arrive at the 1.5 million figure by subtracting the 1.2 million households who are still paying more than 50% of their monthly income on rent (even with the $600/week pandemic unemployment assistance) from the 2.7 million households that the Urban Institute expect to pay more than 50% of their income toward rent. Now that the $600 payment has expired (July 31), we can expect the number of severely rent-burdened households in America to double in the coming months.

[33] Indeed, of all the businesses adversely affected by the economic consequences of the social distancing measures required by COVID-19, the business of owning rental property is likely one of the least-hard-hit sectors. Bars, restaurants, churches, day cares, hotels: their work has been made virtually impossible by the pandemic and social distancing measures still necessary to prevent the spread of SARS-CoV-2. Because they provide an essential service (indeed, housing is even *more essential* as "home" is now also "office" and "school" for many Kentuckians), most Kentuckians will devote the first dollars they get to securing their housing so they can remain #HealthyAtHome.

[34] "Joblessness remains at historic levels" at https://www.epi.org/blog/joblessness-remains-at-historic-levels-the-extra-600-in-ui-benefits-expires-next-week-congress-must-extend-it/

bottom lines than the measures Defendants have taken to protect homerenters, law enforcement, court personnel, litigants, and the public from a deadly and spreading virus.

### 5. Everyone needs more time.

The landlords in this case ask the Court to allow it the extreme remedy of forcing someone from their home during a pandemic and economic crisis. Plaintiffs ask for this remedy to be available to them despite the facts that: 1) many government programs have been crafted specifically to benefit them, 2) they are the indirect beneficiaries of other expensive government programs (unemployment benefits, emergency stimulus payments, etc), 3) they have (and have had) the ability to file collections actions *right now* against non-paying homerenters, 4) they have not proven any actual financial harm as a result of the "several" nose-thumbing renters they each have, and 5) evicting people from their homes is dangerous, deadly, and completely inhumane right now.

Everyone involved in the eviction process needs more time:
- **The Governor** needs more time to process the backlog of unemployment insurance benefits.
- **The Courts** need more time to develop eviction processes that are uniform, safe, and fair. What is happening right now across Kentucky's 120 counties is neither uniform, nor safe, nor fair. That's frustrating to *amici* and needlessly dangerous and destabilizing to Kentuckians. Evictions should be rare in normal times, they *must* be rare in a pandemic. To make that imperative a reality, it will require developing new processes with input from all stakeholders. That work can't happen in a tsunami.[35]

---

[35] The Court should note three facts when considering the potential scope of the tsunami of evictions about to hit Kentucky's most vulnerable people and communities. First, the Kentucky Supreme Court provided almost no notice that it was going to allow evictions for nonpayment of rent beginning on August 1. Many landlords and their lawyers may not have been prepared to file on the first day (or week) they could file.

Second, as mentioned above, the additional $600/week pandemic unemployment insurance benefit expired on July 31. September 1 is going to come soon and rent will be due once again and when it does, *many thousands* more Kentuckians won't be able to pay rent.

Third, landlords who are currently prohibited from filing evictions for nonpayment of rent because they own CARES Act-protected properties will begin to be able to file those on August 24th. Taken together, these three factors would mean **absolute disaster** for tens of thousands of Kentuckians if the Court finds Governor Beshear's prohibition on set-outs unconstitutional.

- **Local governments and agencies** need more time to spin up programs to distribute the rental assistance funding in the CARES Act that they have yet to receive from the federal government. For example, a report on Monday explained that a Shelbyville homerenter "will eventually be able apply for rent relief through the Kentucky Housing Corporation, but as of Friday morning, that agency had not yet received its portion of the CARES Act funding through the U.S. Department of Housing and Urban Development— even though the agency finished the application process in June." Ryan Van Velzer, "Kentucky's Eviction Crisis Delayed, Not Averted" August 10, 2020 at https://wfpl.org/kentuckys-eviction-crisis-delayed-not-averted/.
- **Landlords** need more time to apply for rental assistance in the few areas (including Louisville) that have received the rental assistance funding in the CARES Act. Louisville has $22,000,000 earmarked for rental assistance for which landlords can apply to cover missed rent payments. According to an August 5 story in LEO Weekly, the uptake rate in Louisville among landlords for this rental assistance has been extremely low. Marilyn Harris with Louisville Metro's Office of Housing said, "[her] department has only received 13 requests for money from landlords." Danielle Grady, "Here is how you can get rental help because million$ await" (August 5, 2020 at https://www.leoweekly.com/2020/08/here-is-how-you-can-get-rental-help-because-million-await/
- **Congress** needs more time to pass additional coronavirus aid.
- **Homerenters** need more time to get back to work, get those unemployment benefits, get the rental assistance[36] available to them, or get out of the rented home and move back in with mom.

**Everyone needs more time.** Everyone hears the egg timer ticking on the counter. Everyone hears it. Everyone is working hard to beat the clock. Plaintiffs are asking this Court to pick up the egg timer, spin the dial to high noon, and make it ding.

The Court should do no such thing.

## Conclusion

Plaintiffs have offered no proof of their actual harm. Meanwhile, Kentuckians are getting sick and dying every day from a virus we have yet to get under control. Plaintiffs ask this Court to

---

[36] Rental assistance is also available in Louisville directly to homerenters. In that same LEO Weekly story linked above, the Neighborhood Place said they'd been able to distribute rental assistance from a pool of $6,000,000 to about 100 homerenters.

elevate their right to physical possession of their residential rental property above Kentuckians' rights to be secure in their homes—rented or owned—during a pandemic and economic crisis. It's not a serious request (and not one that Plaintiffs have even come close to showing they are worthy of even if it were). No one is cancelling rent. Everyone who owes rent is subject to a collection action and garnishment. If the Plaintiffs haven't availed themselves of that option to collect the money owed to them, that's their problem, not Defendants' and not this Courts'.

The Governor and the federal government have made Orders and created programs to assist landlords like Plaintiffs. The additional relief Plaintiffs are seeking from this Court—the right to put people on the street during a global pandemic—is a dark, cynical, and wholly unsupported request.

The Court should quickly deny Plaintiffs' Motion for a Temporary Injunction so that the Governor, Kentucky Supreme Court, and organizations like *amici* can get back to the work of actually trying to be helpful in a crisis.

Respectfully submitted,

/s/ Ben Carter
Ben Carter
Kentucky Equal Justice Center
222 South 1st Street, Suite 305
Louisville, KY 40202
ben@kyequaljustice.org
502-303-4062
On behalf of *Amici Curiae*