**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**
**CIVIL ACTION NO. 20-cv-96-DLB-CJS**

**GREATER CINCINNATI NORTHERN**
**KENTUCKY APARTMENT ASSOCIATION,** *et al.*                    **PLAINTIFFS**

**v.**

**JOHN C. MIDDLETON, in his official capacity**
**as Circuit Clerk for the 16th Judicial Division,** *et al.*              **DEFENDANTS**

* * * * * * * * * * * *

## DEFENDANT, GOVERNOR ANDREW BESHEAR'S RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Comes now the Defendant, Governor Andrew Beshear ("Governor Beshear"), by and through counsel, and for his Response in Opposition to Plaintiffs' Emergency Motion for a Restraining Order and/or a Preliminary Injunction, hereby states as follows:

### INTRODUCTION

The COVID-19 pandemic is the gravest threat to the public health in over a century.  In response to the pandemic, and in an effort to protect public health and curb transmission of the disease, Governor Beshear temporarily suspended evictions from residential premises in the Commonwealth for failure to pay rent.  He achieved this via Executive Order, and limited the duration of the Order to the State of Emergency.  Kentuckians cannot be "healthy at home" without a home.

Plaintiffs seek a restraining order and/or preliminary injunction to prohibit the enforcement of Governor Beshear's Executive Order 2020-323,[1] the order at issue in this litigation.  More specifically, Plaintiffs allege that Executive Order 2020-323 violates their constitutional rights by:

---

[1] (*See* RE 1, pp. 31-35.)

(1) infringing upon their right to petition the government, in contravention of the First Amendment; (2) disregarding the Impairment of Contract Clause found in Article 1, Section 10 of the United States Constitution; (3) running afoul of the Equal Protection Clause of the Fourteenth Amendment; and (4) improperly intruding upon their right to procedural and substantive due process (*See* Plaintiffs' Complaint and Emergency Motion, RE 1 and RE 5).  Based upon these claimed violations, Plaintiffs contend that a restraining order and/or preliminary injunction is necessary, in order to preclude an unlawful restraint upon their constitutional rights.

As the Court knows, Governor Beshear's Executive Order suspending a portion of the eviction process was only issued because of—and as a direct response to—the unprecedented public health crisis brought about by the COVID-19 pandemic.  Like many other public officials in both the United States and abroad, the Governor is faced with the difficult task of implementing a variety of measures to ensure the health and safety of his constituents.  Among those measures is the Executive Order Plaintiffs challenge here.  While Governor Beshear acknowledges the difficulties Kentucky landlords may face as a result of that Order, its issuance was necessary to combat the transmission of COVID-19 within the Commonwealth.  In bringing their Motion, Plaintiffs fail to appreciate the significant and compelling interest the Commonwealth has in preventing a homelessness crisis while in the midst of a global pandemic.  Furthermore, Plaintiffs plainly fail to recognize the broad statutory authority afforded to Governor Beshear during a declared State of Emergency pursuant to KRS 39A.100.  In fact, under KRS 39A.100(j), the Governor is expressly permitted to "perform and exercise… functions, powers, and duties deemed necessary to promote and secure the safety and protection of the civilian population".  *Id*.  In addition, the Court's analysis of any gubernatorial state action taken in accordance with that statute requires a deferential approach, which considers the entire set of circumstances giving rise to the

restrictions in question.  In rejecting similar legal challenges to executive actions on evictions, courts across the country have understood the importance of that deferential approach within the context of the COVID-19 pandemic. *See Elmsford Apartment Assocs., LLC v. Cuomo*, 2020 WL 3498456 (S.D.N.Y. June 29, 2020); *Gregory Real Estate and Management LLC v. Miles M. Keegan*, CV-2020-007629 (Superior Court of Arizona, July 22, 2020);[2] *JL Properties Group B, LLC v. Pritzker*, Case No. 20-CH-601 (Twelfth Circuit Court of Illinois, July 31, 2020);[3] *Private Properties, LLC v. Wolf*, Case No. 90-MM-2020 (Supreme Court of Pennsylvania, July 31, 2020);[4] *San Francisco Apartment Ass'n v. City and County of San Francisco*, Case No. CPF-20-517136 (California Superior Court, August 3, 2020);[5] *Auracle Homes, LLC v. Lamont*, 2020 WL 4558682 (D. Conn. Aug. 7, 2020).  Finally, Plaintiffs' Motion completely ignores the existing legal remedies at their disposal in the event that a tenant fails or refuses to issue an agreed upon rent payment.  Indeed, Plaintiffs continue to have access to the Courts for the purposes of initiating breach of contract actions for the recovery of pecuniary damages stemming from a tenant's non-payment.

Because, here, Governor Beshear's Executive Order 2020-323 has a real and substantial relationship to the legitimate public health interest of promoting and securing the safety and protection of Kentucky's civilian population—while maintaining Plaintiffs' right to seek redress through the Courts—it clearly satisfies constitutional requirements.  As such, the Court should reject Plaintiffs' motion for a restraining order and/or preliminary injunction.

---

[2] Attached hereto as Exhibit A.
[3] Attached hereto as Exhibit B.
[4] Attached hereto as Exhibit C.
[5] Attached hereto as Exhibit D.

## FACTUAL BACKGROUND

First identified in Wuhan, Hubei Province, China in December 2019, the World Health Organization ("WHO") declared the spread of the virus a Public Health Emergency of International Concern on January 30, 2020.[6]   The next day, the U.S. Department of Health and Human Services declared a public health emergency, which the Department has twice renewed, most recently on July 25, 2020.[7,8]   *See* 42 U.S.C. § 247d. The WHO declared COVID-19 a pandemic on March 11, 2020.[9] Separately, President Donald Trump declared a national emergency on March 13, 2020.[10]   For the first time in history, the President declared all 50 states a major disaster area.[11]   Upon the first confirmed case of coronavirus in Kentucky on March 6, Governor Beshear declared a state of emergency pursuant to KRS Chapter 39A.   Subsequently, all 120 Kentucky counties declared a state of emergency.[12]   In only a few short months, COVID-19 has spread across the United States to infect over 5,000,000 people, while causing the deaths of more

---

[6] World Health Organization, *WHO Director-General's Statement On [International Health Regulations] Emergency Committee On Novel Coronavirus (2019-nCoV)*, Jan. 30, 2020, available at https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov) (last visited July 27, 2020).

[7] U.S. Department of Health and Human Services, *Determination That A Public Health Emergency Exists*, available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited July 27, 2020).

[8] U.S. Department of Health and Human Services, *Renewal of Determination That A Public Health Emergency Exists*, available at https://www.phe.gov/emergency/ news/healthactions/phe/Pages/covid19-23June2020.aspx (last visited July 27, 2020).

[9] World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020*, Mar. 11, 2020, available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited July 27, 2020).

[10] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, The White House, Mar. 13, 2020, available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited July 27, 2020).

[11] Michael Ruiz, *Coronavirus: Trump has declared major disaster in all 50 states at once, first time in history*, Fox News, Apr. 11, 2020, available at https://www.foxnews.com/politics/coronavirus-trump-declared-major-disaster-in-all-50-states-first-time-history (last visited July 27, 2020).

[12] The Kentucky Association of Counties, COVID-19 County Emergency Declarations, available at https://www.kaco.org/en/county-information/covid-19-resources/covid-19-emergency-declarations.aspx (last visited July 27, 2020).

than 160,000 people.[13]  In fact, on August 13, 2020, the Commonwealth of Kentucky reported 785 new cases of COVID-19.[14]  In the absence of state action, these numbers would undoubtedly be even more staggering.[15]

Governor Beshear initially issued Executive Order 2020-257, which has now been superseded by Executive Order 2020-323, in an effort to "flatten the curve" and decrease the proliferation of COVID-19.  While the scientific evidence continues to evolve, early studies have shown that mass gatherings are particularly conducive to the spread of COVID-19, in a way that transitory encounters—such as passing someone in the grocery store—are not.  For example, a study of an outbreak originating in a restaurant in Guangzhou, China, found that individuals seated near the infected person for an hour or more contracted COVID-19, while the wait staff, who had repeated transitory encounters with that person, did not become infected.[16]  In this case, the Executive Order was issued in an effort to prevent that very type of prolonged mass congregation that would become an unfortunate inevitability were individuals forced from their houses into shelters, group homes, or public spaces as a result of evictions.

The Commonwealth's primary interest is one of public health, and lies in limiting the unnecessary spread of COVID-19 wherever possible.  The Executive Order suspending evictions has a real and substantial relationship to that purpose, as it seeks to prevent a significant increase

---

[13] Cases in the US, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed August 12, 2020).

[14] Eli Gehn, *785 new COVID-19 cases reported in Kentucky*, LEX 18 News, https://www.lex18.com/news/coronavirus/785-new-covid-19-cases-reported-in-kentucky.

[15] *See* Charles Courtemanch, Joseph Garuccio, Ahn Le, Joshua Pinkston, Aaron Yelowitz, *Did Social-Distancing Measures in Kentucky Help to Flatten the COVID-19 Curve?*, Gatton College of Business and Economics, Institute for the Study of Free Enterprise, Working Paper 29, available at http://isfe.uky.edu/sites/ISFE/files/research-pdfs/NEWISFE%20Standardized%20Cover%20Page%20-%20Did%20Social%20Distancing%20Measures%20in%20Kentucky.pdf (last visited July 27, 2020).

[16] Jianyun Lu, *et. al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant*, Guangzhou, China, 2020, Emerging Infectious Diseases, Vol. 26, No. 7 (July 2020), available at https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited July 27, 2020).

in Kentuckians displaced from their homes.  Indeed, that Order continues to allow landlords to move forward with an eviction action, and only temporarily postpones the final element of such an action—the set out—in order to provide a variety of protections to tenants which are aimed at preventing a significant uptick in homelessness, as well as the associated rise in COVID-19 cases that would invariably accompany such a crisis.  Thus, Plaintiffs' apparent framing of the Executive Order as an action aimed at providing economic relief to tenants is wrong

Additionally, the Executive Order protects the health of not only those potentially displaced tenants, but the public at large that might encounter them in public spaces.  This scenario, if left unaddressed, would render compliance with the CDC's social distancing guidelines effectively impossible, as evictions would necessarily result in families being removed from their homes and left unable to be healthy at home.  Indeed, for the newly homeless, gathering in public areas where public resources can be accessed is a necessity.  Instead, with the Executive Order in place, individuals potentially subject to eviction are provided with an assurance that they will not be displaced from their homes during the height of the COVID-19 crisis, thereby reducing the risk of community spread.

Lastly, because the Executive Order explicitly notes that it does not relieve tenants of the obligation to pay rent, make mortgage payments, or otherwise comply with any obligation they may have under a tenancy or mortgage, it is clear that the Order does not foreclose Plaintiffs' ability to exercise their constitutional property rights, as it still allows them to obtain a monetary judgment in relation to any breach for non-payment.  This remedy exists separate and apart from an eviction action, which does not afford a claimant any right to a monetary judgment.  *See* KRS

383.240 and KRS 383.660.[17]   Thus, Plaintiffs' arguments to the contrary are without merit and should be rejected.

## APPLICABLE LAW

Preliminary injunctive relief "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  To issue a preliminary injunction, the Court must consider: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id*.

In addition, judicial review of temporary emergency public health measures is "limited to a determination of whether the . . . actions were taken in good faith and whether there is some factual basis for [the] decision that the restrictions . . . imposed were necessary to maintain order." *U.S. v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971).  Under this review, when a state enacts an emergency public health measure, the measure will be upheld unless: (1) there is no "real and substantial relationship" to the public health; or (2) the measure is "beyond all question" a "plain, palpable invasion of rights secured by fundamental law." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30 (1905).[18]   As stated by Chief Justice Roberts in *South Bay*, "Our Constitution principally entrusts '[t]he safety and the health of the people'" to the politically accountable officials of the States "to guard and protect.'"  140 S. Ct. at 1613 (quoting Jacobson 197 U.S. at 38). "When those officials 'undertake[ ] to act in areas fraught with medical and

---

[17] While KRS 383.240 does allow for recovery of costs associated with a successful action, and under KRS 383.660 a landlord may potentially recover damages or attorney's fees, neither statute provides for recovery of rent owed.

[18] The United State Supreme Court recently cited to this opinion in support of its decision in *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020).

scientific uncertainties,' their latitude 'must be especially broad.'" *Id.* (quoting Marshall v. United States, 414 U.S. 417, 427 (1974)). Furthermore, there can be no dispute as to whether housing constitutes a public interest justifying police power, as the United States Supreme Court has confirmed that it does. *See Block v. Hirsh*, 256 U.S. 135, 156 (1921) ("Housing is a necessary of life. All the elements of a public interest justifying some degree of public control are present."). Under the framework of the above-referenced authority, it is apparent that Plaintiffs have failed to satisfy their burden.

## ARGUMENT

As the following analysis makes clear, each of the four factors to be considered by the Court in assessing Plaintiffs' Motion for Preliminary Injunction weigh heavily in Governor Beshear's favor.  As such, that Motion should be denied.

## I.      Plaintiffs Fail To Demonstrate A Strong Likelihood Of Success On The Merits.

The first factor for the Court's consideration in determining whether to provide Plaintiffs their requested relief is the likelihood of Plaintiffs' success on the merits.  As the following argument establishes, it is clear that Plaintiffs have failed to meet this burden.

### A.      Plaintiffs Have Not Been Deprived of Their Right to Petition the Government.

In moving for a restraining order and/or preliminary injunction, Plaintiffs paint a picture in which they will be deprived of an eviction remedy for an indefinite period of time, emphasizing that the suspension of non-payment evictions has "absolutely no expiration date and may extend into the future for perpetuity" (*See* RE 5-1 at p. 2).  This is, in fact, inaccurate and directly contrary to the terms of the actual Order, which states that the Order shall only be in effect "for the duration of the State of Emergency herein referenced."  *See* Executive Order 2020-323 at p. 5.  The Executive Order unambiguously states that it will only extend as long as the public health crisis

continues.  As such, the argument that Plaintiffs could be forever precluded from obtaining an eviction holds no weight and should not be given any consideration.

Although Plaintiffs' ability to pursue the enforcement of evictions has been left unaffected, outside of a temporary pause to the final step—the set out—Plaintiffs' constitutional right to petition the government remains adequately satisfied through their ability to file a traditional lawsuit against any individual who is alleged to have breached the terms of their lease or mortgage agreement.  Indeed, even a cursory review of Governor Beshear's Executive Order demonstrates that Plaintiffs have not been left without any right to judicial redress.  Instead, that Executive Order simply implements a temporary modification to the process for obtaining an eviction during the Commonwealth's declared State of Emergency, taking into consideration the government's substantial and compelling interest in keeping Kentuckians healthy at home, so as to reduce the swell of COVID-19 cases.

For a First Amendment Petition claim, "***meaningful access to the courts is the touchstone***," and Plaintiffs must therefore show that the Governor's actions "hindered [their] efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343 (1996) (emphasis added).  Here, Plaintiffs cannot possibly satisfy that burden, as they are still free to pursue a legal claim against their tenants, and their ability to obtain a set out has only been temporarily delayed.  Plaintiffs have never been denied access to Kentucky's courts because of the Executive Order, and their citation to *ACA Int'l v. Healey*, No. CV 20-10767-RGS, 2020 WL 2198366 (D. Mass. May 6, 2020), is therefore unconvincing.

In that case, the Massachusetts Attorney General issued an emergency regulation that effectively outlawed legal remedies of any kind, in any state or federal court, for a whole class of creditors, debt buyers, and collections agencies.  In contrast, Governor Beshear's Executive Order

merely postpones the enforcement of one of several available legal avenues through which Plaintiffs can seek relief, while leaving the variety of other alternatives unbothered. For example, there is absolutely no restriction upon Plaintiffs' ability to file a lawsuit for monetary damages, and to obtain a judgment equal to whatever amount of unpaid rent is owed (a financial remedy which is unavailable in an eviction proceeding). And, of course, non-judicial remedies may well be utilized to address the landlord's overriding concerns. The tenant and landlord can engage in forms of alternative dispute resolution which could result in payment plans, the safe transition of the tenant to more affordable housing, or other arrangements to ensure that landlords' financial concerns are addressed while the health of the tenant, and the public, remain protected. Indeed, the Kentucky Supreme Court has recently announced a pilot program in Jefferson County, Kentucky, to attempt to resolve evictions before tenant displacement occurs, with an intent to expand the program statewide.[19] As such, it is obvious that Plaintiffs have not been prohibited from petitioning the government, and, further, that their overriding interests can be accommodated through numerous means. Therefore, the Court should reject their argument on that basis.

**B.    Governor Beshear's Executive Order is Not an Unconstitutional Contractual Impairment.**

Similarly, the Executive Order does not represent an unconstitutional impairment on contracts, as it specifically notes a lessee or mortgagor's continued obligation to pay rent, make mortgage payments, and/or comply with any other duty that they may have under a tenancy or mortgage. This language plainly signals an intent for Plaintiffs' continued ability to enforce their contractual rights through the pursuit of a lawsuit.

---

[19] *See* Vogt, Dustin, *New program created by Ky. Supreme Court to reduce eviction cases in Jefferson County*, WAVE 3 News, Aug. 11, 2020, available at: https://www.wave3.com/2020/08/11/new-program-created-by-ky-supreme-court-reduce-eviction-cases-jefferson-county/ (last visited Aug. 13, 2020).

In deciding whether a plaintiff has demonstrated that a change in state law has operated as a substantial impairment to a contractual relationship in violation of the Contract Clause, courts must ask whether: (1) a contract exists; (2) a change in law impairs that contract; and (3) the impairment is substantial. *Mascio v. Pub. Employees Ret. Sys. of Ohio*, 160 F.3d 310 (6th Cir. 1998). If a contractual obligation is substantially impaired by the change in law, the court must further inquire whether the adjustment of the parties' contractual rights was reasonable and appropriate in the service of a legitimate and important public purpose. *Id*. When the challenged law only impairs private contracts—as it does here—and does not impair contracts to which the state is a party, courts "must accord substantial deference to the [state's] conclusion that its approach reasonably promotes the public purposes for which [it] was enacted." *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) (citing *Energy Reserves Grp., Inc. v. Kan, Power & Light Co.*, 459 U.S. 400 (1983)). Accordingly, the law affords states a wide berth to infringe upon private contractual rights when they do so in the public interest, rather than in self-interest. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977).

From the outset, it should be pointed out that Plaintiffs have not clearly established that their rental agreements expressly provide them with a contractual right to pursue evictions. As such, Plaintiffs fail to satisfy their burden in alleging a violation of the Contract Clause under the United States Constitution on the very face of their Complaint and accompanying Emergency Motion. Nevertheless, if this Court is inclined to consider Plaintiffs' position, it must do so in a manner that is consistent with the binding precedent of the United States Supreme Court.

In addressing the Contracts Clause, the Supreme Court has stated, "[r]egulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves Grp., Inc.*, 459 U.S. at 411. This is especially true where

"the industry the complaining party has entered has been regulated in the past." *Id*.  Without question, the renting of residential property is a heavily regulated industry.  The Supreme Court has further noted that "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." *U.S. Trust*, 431 U.S. at 19.

Here, the Executive Order does little to alter the express terms of the contracting parties' agreements, and, where any adjustments are made, they are reasonable, appropriate, and geared towards the service of a legitimate and important public purpose.  Primarily, the Order merely modifies the manner in which Plaintiffs may enforce one particular remedy—an eviction— pursuant to state law.  Tenants are still bound by their contracts, and Plaintiffs may still obtain a judgment for unpaid rent if the tenants fail to honor the obligations of their agreements.  Indeed, the Order is clear that any restriction on Plaintiffs' avenues of legal redress are limited both temporally and in scope.  The terms of that Order are certainly reasonable and appropriate in light of the realities created by the COVID-19 pandemic, and it is indisputably intended to service the legitimate and important public purpose of preventing the further spread of the virus.  Invalidating the Executive Order would only serve to exacerbate the public health crisis already faced by the Commonwealth.

The Supreme Court has previously held that "[t]he obligations of a contract are impaired by a law which renders them ***invalid, or releases or extinguishes them***." *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398 (1934) (emphasis added).  It has also stated that the Contracts Clause should not be interpreted to prohibit "limited and temporary interpositions with respect to the enforcement of contracts[,] if made necessary by a great public calamity." *Id*. at 439.  A plain

reading of this language confirms the Executive Order does not offend the Supreme Court's substantiality standard for an unconstitutional contractual impairment.

Additionally, even if the temporary postponement of the eviction remedy's set out component is deemed to be a substantial contractual impairment, that impairment does not rise to the level of a constitutional violation—especially in light of the government's significant countervailing interest in the safety and well-being of its residents. Because an impairment will only be struck down under the Contracts Clause if it is not "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose,'" *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018), it is clear the Executive Order should stand because it does not constitute an infringement upon that clause. To the contrary, the Order has been appropriately drawn to place a limited delay on the enforcement of the set out, for the vitally important purposes of allowing Kentucky residents to be able to adhere to CDC and state public health guidelines and in an effort to shield impacted tenants, as well as the general public, from the potentially deadly consequences of COVID-19. As such, Plaintiffs' contractual impairment argument must fail.

### C. Governor Beshear's Executive Order Does Not Violate the Equal Protection Clause of the United States Constitution.

Likewise, Plaintiffs have not effectively established a violation of the Equal Protection Clause of the United States Constitution. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff "disparately as compared to similarly situated persons[,] and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). The "***threshold element of an equal protection claim is disparate treatment***." *Id*. (emphasis added).

Here, Plaintiffs cannot satisfy this threshold requirement, as they are unable to show that they have been treated differently than other similarly situated persons—landlords across the Commonwealth.   Because the Executive Order applies uniformly to landlords throughout Kentucky, Plaintiffs' equal protection claim falls flat before it even reaches the second prong.

Furthermore, while Plaintiffs argue that the Executive Order's failure to tie an individual's inability to pay rent directly to a COVID-19 hardship is demonstrative of its overly broad nature, their position frames the issue incorrectly.   First, the Order does not need to be narrowly tailored, as the *Jacobson* Court expressly stated that an emergency public health measure should be upheld unless it (1) "has no real or substantial relationship to [the emergency]", or (2) "is, ***beyond all question***, a plain, palpable invasion of rights secured by the fundamental law[.]" *Jacobson*, 197 U.S. at 30 (emphasis added).   However, even if the Order were subject to strict scrutiny, it nonetheless passes constitutional muster.   The Order's principal purpose is to ensure the health and safety of the general public, with relief from financial strain serving only as a tangential, secondary benefit.   Because the vast majority of evictions within the Commonwealth stem from the non-payment of rent or mortgage obligations, the Executive Order has been specially crafted to address that particular situation, so as to preclude displacement of the largest portion of Kentuckians potentially subject to eviction, thereby reducing the risk of mass public exposure to COVID-19.   In short, the Order is meant to ensure that as few Kentuckians as possible are left subject to eviction with no other available housing options, while preserving the landlords' ability to seek eviction and set out for scenarios where their properties are truly in danger through neglect, dangerous activity, or other scenarios involving considerations other than those that are strictly monetary.   As such, Governor Beshear's Executive Order is narrowly tailored, which is more than is required by *Jacobson*, to achieve a legitimate government interest—the continued health and

14

welfare of Kentucky residents—and, therefore, it does not violate the Equal Protection Clause under the Fourteenth Amendment.

**D.      Plaintiffs' Due Process Rights Have Not Been Violated.**

Lastly, Plaintiffs have also failed to sufficiently allege any due process violation.   To establish a procedural due process claim pursuant to § 1983, plaintiffs must demonstrate three elements: (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (2) that they were deprived of this protected interest within the meaning of the Due Process Clause; and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest. *Hahn v. Star Bank*, 190 F.3d 708 (6th Cir. 1999).

As noted above, Plaintiffs have not been deprived of their property interest, as they are still afforded an avenue to pursue the enforcement of their property rights, through the initiation of a lawsuit against a non-compliant tenant who is in breach of their lease agreement.   In fact, such a cause of action would likely be the ideal remedy against the "bad actors" who form the focus of much of Plaintiffs' Complaint, because any individual who has money but has simply refused to pay would have recoverable assets through which Plaintiffs could obtain relief.   In addition, the Executive Order's temporary modification of eviction proceedings is not a true *deprivation* of Plaintiffs' right to possession, but instead is only a *short-term restriction* of that possessory right necessitated by the circumstances of the COVID-19 pandemic.

Meanwhile, Plaintiffs have not identified any property interest that is independent of those interests which were already addressed by their other constitutional claims.   The Supreme Court has held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not

the more generalized notion of "substantive due process," must be the guide for analyzing these claims."" *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702 (2010). Here, Plaintiffs' claimed violation of substantive due process stems only from their allegation that the Executive Order violated other "explicit textual source[s] of constitutional protection"—namely, the First Amendment right to petition, the Article One Impairment of Contracts Clause, and the Fourteenth Amendment Equal Protection Clause.  As such, Plaintiffs' substantive due process claim also fails.

## II.   Plaintiffs Will Not Suffer Irreparable Harm If Their Injunction Is Denied.

The second factor relevant to the Court's decision is the potential for irreparable harm to the Plaintiffs in the event that their request for injunctive relief is denied.  This requirement is absolute, as the Sixth Circuit has stated that "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'"  *D.T. v. Sumner County Schools*, 942 F.3d 324, 326-27 (6th Cir. 2019) (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).  "Thus, although the extent of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Id*. at 327 (emphasis original).  Furthermore, the Sixth Circuit has also stated that to merit a preliminary injunction, "an injury 'must be certain and immediate,' not 'speculative or theoretical.'" *Id*. (citing *Mich. Coal. Of Radioactive Materials Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).  Plaintiffs' Complaint and Motion fail on this prong.

As outlined above, Plaintiffs' right to pursue monetary damages from tenants for the non-payment of rent remains in full force and effect, as they are free to file suit for breach of contract under the terms of the Executive Order.  The Sixth Circuit has previously held that a plaintiff's harm is not irreparable if it is fully compensable by money damages, *Basicomputer Corp. v. Scott*,

973 F.2d 507, 511 (6th Cir. 1992).  That is precisely the scenario before this Court.  Simply stated, the injuries to Plaintiffs are monetary in nature.  Plaintiffs repeatedly concede that the Executive Order applies to "non-payment of rent evictions" (*see, e.g.* RE 5-1 at pp. 1, 2, 4, 5, 6, 7, 11, 12, 17, and 19.)  Indeed, Plaintiffs have not been foreclosed from pursuing evictions for instances where there is irreparable danger to their property.  The limited scope of the Executive Order applies only to monetary issues—namely, the payment of rent.  As noted above, it is a "well-established principle" of equity that a plaintiff must demonstrate "that remedies available at law, such as monetary damages, are inadequate to compensate" the Plaintiff.  *See*, *e.g., eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Plaintiffs may attempt to couch their injuries in other terms, but the Executive Order lays bare that the only harm to Plaintiffs is delayed enforcement of a specific remedy.

Moreover, Plaintiffs' right to enforce an eviction action has not been eliminated altogether, but has only been temporarily delayed due to the public health emergency brought about by the onset of COVID-19.  Plaintiffs remain free to elect an eviction proceeding, but simply must do so under the modified terms outlined by the Executive Order, so as to afford tenants an opportunity to prevent a home displacement that would negatively impact upon overall public health.  Indeed, this goes directly to the compelling governmental interest in this case.  As previously stated, the Governor's Executive Order is not an economic measure, but, rather, a public health one.  Landlords can be made whole through other available court processes.  Quite simply, Plaintiffs' continued access to legitimate legal redress through the judicial system for purely economic considerations forecloses any argument of irreparable harm.

### III.   Issuance Of Plaintiffs' Requested Injunction Would Cause Substantial Harm To Others.

The third factor for the Court's consideration is whether issuance of the injunction would cause substantial harm to others.  Here, there can be no doubt that it would.  Granting Plaintiffs' requested relief would force an untold number of individuals out of their homes and into the streets, where they would be unable to escape physical exposure to hundreds, if not thousands, of other people who have been placed in the same situation.  If Plaintiffs' Motion is granted, countless Kentuckians will be placed at risk for the contraction of COVID-19, which would inescapably lead to serious health issues—and possibly even death—for both those who are evicted and the public at large.  This regrettable reality is illustrated through a recent survey published by CNBC, in which it was estimated that forty-eight percent (48%) of Kentucky renters would be at risk for eviction due to an inability to pay rent.[20]  Further, those evicted would not be the only individuals subject to greater risk.  To the contrary, every single person who may come into contact with the recently displaced—whether it be a community volunteer, or simply a passerby—would also be placed at increased risk for exposure to COVID-19.

The Mayo Clinic has compiled information from the Centers for Disease Control and Prevention ("CDC") and the World Health Organization ("WHO") regarding methods to reduce the risk of infection of COVID-19.[21]  Those measures include: avoiding mass gatherings; avoiding close contact (within six feet) with anyone who is sick or has symptoms; staying home as much as possible; washing your hands often; avoiding sharing dishes, towels, bedding and household items; and staying away from public areas if you are sick.  They further advise that older individuals and

---

[20] Annie Nova, *How the Eviction Crisis Across the U.S. Will Look*, 2020 CNBC, July 27, 2020, available at https://www.cnbc.com/2020/07/27/how-the-eviction-crisis-will-impact-each-state.html (last visited July 28, 2020).
[21] Coronavirus disease 2019 (COVID-19), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last visited Aug. 13, 2020).

those with existing chronic medical conditions may have a higher risk of serious illness related to COVID-19.   These chronic medical conditions include chronic obstructive pulmonary disease (COPD), diabetes, and high blood pressure (hypertension).

It is not difficult to see how a mass of summary evictions would quickly make the Mayo Clinic's recommendations extremely difficult, if not impossible to follow.   Those immediately displaced from their dwellings for non-payment of rent may indeed have no choice but to resort to shelters or public spaces.   These individuals cannot "stay home," as they would no longer have a home in which to stay.   Additionally, access to even the simplest of things—including soap and water—could become an insurmountable challenge.   These individuals may have limited or no access to sanitation items, household cleaners, and washing machines, thus preventing them from abiding by the CDC and WHO's recommended measures.   Further, those Kentuckians suffering from chronic illness would be put at even greater risk.   According to the Partnership to Fight Chronic Disease, as of 2015, 2.9 million Kentuckians suffered from at least one chronic disease, and 1.3 million Kentuckians had 2 or more chronic diseases, of which 584,000 had three or more.[22] Though all Kentuckians would be placed at risk should evictions proceed without restriction or limitation, the most vulnerable among us would be placed at even higher risk.

But it is not merely those that are evicted that would likely experience harm.   Those that suddenly find themselves without a dwelling would obviously have to find somewhere to go.   True, in some communities shelters exist, but in many communities they do not.   Thus, these evicted individuals could find themselves forced to stay in public places—places where others may have to go.

---

[22] What is the Impact of Chronic Disease on Kentucky?, Partnership to Fight Chronic Disease, https://www.fightchronicdisease.org/sites/default/files/download/PFCD_KY_FactSheet_FINAL1.pdf (last visited Aug. 13, 2020).

Clearly, the harm to others is significant—to both the evicted and the public at-large that come into contact with the evicted.   Accordingly, this factor clearly weighs in favor of denying Plaintiffs' Motion.

**IV.    The Public Interest Weighs In Favor Of Denying Plaintiffs' Requested Injunction.**

The fourth and final pertinent factor to the Court's determination is the interest of the public.  The U.S. Supreme Court has previously stated, "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982).  Here, the public would face dire consequences were Plaintiffs' requested injunction to be granted.  Indeed, issuance of that injunction would immediately jeopardize the welfare of Kentuckians across the state (in addition to citizens who may merely be travelling through Kentucky), because allowing summary evictions would remove thousands of individuals from their homes, inherently increasing the chance of COVID-19's community spread.  The Commonwealth has no public interest more significant than the health, safety, and well-being of its citizens, which the continued, unfettered spread of COVID-19 clearly endangers.  As such, this factor clearly weighs in favor of denying Plaintiffs' Motion.

## **CONCLUSION**

The restrictions in Executive Order 2020-323 are entirely constitutional. Because the Executive Order passes constitutional scrutiny—and because the balance of equities weighs heavily against the Court's issuance of Plaintiffs' requested injunction—the Court should deny Plaintiffs' Motion.

Respectfully submitted,

*/s/*S. Travis Mayo
La Tasha Buckner
General Counsel
S. Travis Mayo
Chief Deputy General Counsel
Laura Tipton
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
LaTasha.Buckner@ky.gov
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov


*/s/* T. Chad Thompson
Benjamin Long
General Counsel
Jacob Walbourn
Deputy General Counsel
Public Protection Cabinet
T. Chad Thompson
Deputy General Counsel
Kentucky Horse Racing Commission
Benjamin.Long@ky.gov
Jacob.Walbourn@ky.gov
Chad.Thompson@ky.gov

***Counsel for Governor Andrew Beshear***

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2020, I electronically filed the foregoing Response via the Court's CM/ECF system, causing counsel of record to be served.

<span style="margin-left:3em">/s/ S. Travis Mayo</span>
**Counsel for Governor Andrew Beshear**